FILED

IN THE UNITED STATES DISTRICT COURT 2016 SEP 26  PM 1: 33
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

STEPHEN BUSHANSKY, On Behalf of )
Himself and All Others Similarly Situated, )
)
Plaintiff, )
) Case No. 3:16-cv-1224-J-34JBT
)
)
v. )
)
EVERBANK FINANCIAL CORP., ROBERT )
M. CLEMENTS, W. BLAKE WILSON, )
JOSEPH D. HINKEL, MERRICK R. )
KLEEMAN, W. RADFORD LOVETT, II, )
ARRINGTON H. MIXON, ROBERT J. )
MYLOD, JR., RUSSELL B. NEWTON, III, )
WILLIAM SANFORD, RICHARD P. )
SCHIFTER, and SCOTT M. STUART, )
)
Defendants. )
)

## CLASS ACTION COMPLAINT
## FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## DEMAND FOR INJUNCTIVE RELIEF AND JURY TRIAL

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel,

for his complaint against defendants, alleges upon personal knowledge with respect to

himself, and upon information and belief based upon, *inter alia*, the investigation of counsel

as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of the public stockholders of

EverBank Financial Corp. ("EverBank" or the "Company") against EverBank and its Board

of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder and to enjoin the vote on a proposed transaction, pursuant to which EverBank will be acquired by the Teachers Insurance and Annuity Associate of America ("TIAA"), through its subsidiary TCT Holdings, Inc. ("Parent") and Parent's wholly-owned subsidiary Dolphin Sub Corporation ("Merger Sub") (the "Proposed Transaction").

2.     On August 8, 2016, EverBank and TIAA issued a joint press release announcing that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell EverBank to TIAA.  Under the terms of the Merger Agreement, TIAA will acquire all outstanding shares of EverBank for $19.50 in cash per EverBank common share (the "Merger Consideration").  The Proposed Transaction is valued at approximately $2.5 billion.

3.     The Proposed Transaction is the result of an unfair process and provides the Company's stockholders with inadequate consideration.  As further described below, both the value to EverBank stockholders contemplated in the Proposed Transaction and the process by which defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public stockholders of the Company.

4.     Further, the Board agreed to lock up the deal with a number of coercive deal protection devices in the Merger Agreement, including: (i) a "no-solicitation" clause that prevents the Company from soliciting, and subject to minimal exceptions, from providing non-public information to potential alternate bidders; (ii) an "information rights" provision that requires the Company to promptly advise TIAA of any proposal or inquiries received

from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal; (iii) "matching rights" that allow TIAA five (5) business days to match any superior offer, plus an additional five (5) business day period following a material amendment to the terms and conditions of a superior offer or the submission of a new offer; (iv) a provision requiring that the Company enforce any existing confidentiality, standstill or similar agreement to which EverBank or any of its subsidiaries is a party; (v) a provision requiring EverBank to pay a termination fee of $93.2 million if the Company decides to pursue a competing offer; and (vi) a "force the vote" provision, requiring that the Board submit the Proposed Transaction to a stockholder vote even if the Board has withdrawn its recommendation. The collective effect of these provisions is to chill any potential post-deal market check.

5.     Additionally, EverBank insiders stand to gain handsomely from the Proposed Transaction. In addition to gaining liquidity for their otherwise illiquid shares and options, certain Everbank named executive officers stand to receive substantial benefits in connection with the Proposed Transaction. For example, TIAA announced that EverBank President, Chief Operative Officer ("COO") and director W. Blake Wilson ("Wilson") will become the President and Chief Executive Officer ("CEO") of the combined company and EverBank Chief Financial Officer ("CFO") Steven J. Fischer ("Fischer") will serve as CFO of the combined company. Further, current EverBank Chairman of the Board, CEO and director Robert M. Clements ("Clements") will continue as a member of the Board under TIAA ownership. While EverBank's public stockholders will lose control of the Company for an unfair price, certain Company insiders will substantially benefit if the Proposed Transaction

is consummated.

6.     Unsurprisingly given the unique benefits they stand to receive, certain EverBank directors, executive officers and large stockholders entered into voting agreements with TIAA agreeing to, among other things, vote their EverBank shares (which according to the joint press release constitute approximately 22% of the outstanding Company shares) in favor of the Proposed Transaction.  The Board failed to negotiate for a provision in the Merger Agreement that would have conditioned the Proposed Transaction's approval on the support of a majority of unaffiliated EverBank stockholders.  Thus, with certain EverBank directors, executive officers and large stockholders pledging their approximately 22% equity stake in support of the Proposed Transaction, no more than 28.01% of the Company's remaining stockholders need to support the deal for it to be approved.

7.     Finally, compounding the unfairness of the Proposed Transaction, on August 9, 2016, EverBank filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC").  The Proxy, which recommends that EverBank stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) EverBank management's projections, utilized by the Company's financial advisor, UBS Securities LLC ("UBS") in its financial analyses; (ii) the valuation analyses prepared by UBS in connection with the rendering of its fairness opinion; and (iii) material information concerning the sale process leading up to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as stockholders need such information in order to cast a fully-informed vote in connection with

the Proposed Transaction.

8.      As further discussed below, defendants' failure to disclose material information is critical in light of the inadequate Merger Consideration. The inadequacy of the Merger Consideration is evidenced by the fact that: (i) as recently as July 26, 2016, an analyst at Keefe, Bruyette & Woods set a $21.00 per share price target for the Company, which is $1.50 above the $19.50 Merger Consideration; (ii) the Merger Consideration is a significant discount to EverBank stock's 52-week trading high of $20.76 per share; and (iii) the Company's stock traded above the Merger Consideration as recently as October 27, 2015, when it reached $20.07 per share.

9.      In short, the Proposed Transaction is designed to unlawfully divest EverBank's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such problems are remedied.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act.

11.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and

substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  EverBank is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

13.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of EverBank.

14.     Defendant EverBank is a Delaware corporation with its principal executive offices located at 501 Riverside Avenue, Jacksonville, Florida 33202.  The Company is a diversified financial services company providing banking, mortgages, and investing services. EverBank's common stock is traded on the New York Stock Exchange under the ticker symbol "EVER."

15.     Defendant Clements has been Chairman of the Board, CEO and a director of EverBank and its predecessor companies since 1997.

16.     Defendant Wilson has been President and a director of the Company since 2005, and has been EverBank's COO since 2011.  Defendant Wilson previously served as the Company's Chief Financial Officer ("CFO") from 2002 to 2011.

17.     Defendant Joseph D. Hinkel ("Hinkel") has been a director of the Company since 2011. Defendant Hinkel is Chair of the Audit Committee, and is a member of the Risk Committee.

18.     Defendant Merrick R. Kleeman ("Kleeman") has been a director of the Company since 2009. Defendant Kleeman is a member of the Nominating and Corporate Governance Committee.

19.     Defendant W. Radford Lovett, II ("Lovett") has been a director of EverBank and its predecessor companies since 2004. Defendant Lovett is a member of the Risk Committee.

20.     Defendant Arrington H. Mixon ("Mixon") has been a director of the Company since 2013. Defendant Mixon is Chair of the Audit Committee and a member of the risk committee.

21.     Defendant Robert J. Mylod, Jr. ("Mylod") has been a director of EverBank and its predecessor companies since 2001. Defendant Mylod is Chair of the Nominating and Corporate Governance Committee.

22.     Defendant Russell B. Newton, III ("Newton") has been a director of the Company since 2009. Defendant Newton is a member of the Risk Committee.

23.     Defendant William Sanford ("Sanford") has been a director of the Company since 2006. Defendant Sanford is a member of the Nominating and Corporate Governance Committee.

24.     Defendant Richard P. Schifter ("Schifter") has been a director of the Company since 2010. Defendant Schifter is a member of the Compensation Committee.

25.     Defendant Scott M. Stuart ("Stuart") has been a director of the Company since 2008. Defendant Stuart is Chair of the Compensation Committee.

26.     Defendants Clements, Wilson, Hinkel, Kleeman, Lovett, Mixon, Mylod, Newton, Sanford, Schifter and Stuart are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

27.     TIAA is a Fortune 100 financial services organization that is the leading retirement provider for people who work in the academic, research, medical and cultural fields. TIAA serves over 5 million active and retired employees participating at more than 16,000 institutions and had $889 billion in combined assets under management as of June 30, 2016.

28.     Parent is a Delaware corporation and a wholly-owned subsidiary of TIAA.

29.     Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own EverBank common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

31.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

32.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of August 31, 2016, there were approximately 125,421,296 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by EverBank or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

33.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, among *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

34.     Plaintiff's claims are typical of the claims of the class as Plaintiff and members of the Class were public stockholders of EverBank during the relevant time period.

35.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

36.     A class action is superior to all other available methods for the fair and

efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

37.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

38.     EverBank is a diversified financial services company providing banking, mortgages, and investing services. Based in Jacksonville, Florida, the Company operates through standard banking offices and through its Direct Banking division. EverBank Direct operates by telephone, mail, and over the Internet. As of June 30, 2016, EverBank had over $27.35 billion in total assets and over $18.93 billion in total deposits.

39.     The Company's history can be traced back to 1961 when it was known as Alliance Mortgage Company ("Alliance"). Defendant Clements acquired Alliance in 1994, formed First Alliance Bank ("First Alliance"), and undertook a number of acquisitions. In 2002, First Alliance acquired national direct-to-consumer EverBank, and First Alliance took the EverBank name for its consumer-facing operations. The Company grew to become one of the United States' largest online banks, partially through acquisition of certain divisions of NetBank and substantially all of Bank of Florida – Southwest, Bank of Florida – Southeast, and Bank of Florida – Tampa Bay from the Federal Deposit Insurance Corporation ("FDIC"). Today, EverBank is the official bank of the Jacksonville Jaguars and holds exclusive naming rights to Jacksonville Municipal Stadium.

40.     The Company's recent financial results underscore its promising prospects. Following several difficult quarters, the Company has enjoyed impressive financial results. On January 27, 2016, EverBank issued a press release announcing its financial results for the fourth quarter and full year 2015. For the quarter, GAAP net income available to common stockholders was $42.6 million, compared to $35.5 million year over year. GAAP diluted earnings per share were $0.34, compared to $0.28 year over year. For the full year, GAAP net income available to common stockholders was $120.4 million, compared to $138.0 million year over year. GAAP diluted earnings per share were $0.95 in 2015, compared to $1.10 year over year. Commenting on the financial results, defendant Wilson stated:

> Commercial banking results were strong with record commercial loan originations of $1.2 billion in the fourth quarter and continued commercial deposit growth. We remain focused on driving operational efficiency across our business in 2016 and expect to execute on optimization strategies while still investing in and enhancing our overall client experience.

41.     On April 27, 2016, the Company issued a press release announcing its financial results for the first quarter of 2016. For the first quarter, EverBank reported total assets of $26.6 billion, an increase of 14% year over year. Total deposits were $19 billion, an increase of 18% year over year. Tangible common equity per common share was $13.23, an increase of 5% year over year. Commenting on the favorable results, defendant Wilson remarked:

> Residential and commercial loan sales increased during the quarter driven by strong demand for the high quality loans we originate. We are pleased with our continued robust deposit growth which reflects the strength of our banking franchise.

42.     On July 26, 2016, the Company issued a press release announcing its financial results for the second quarter of 2016. For the second quarter, EverBank reported total assets

of $27.4 billion, an increase of 13% year over year. Total deposits were $18.8 billion, an increase of 14% year over year. Tangible common equity per common share was $13.24, an increase of 2% year over year.

**The Flawed Sale Process**

43.     Beginning in the fourth quarter of 2015, the Company began consulting with UBS, the Company's financial advisor, and Sullivan & Cromwell LLP ("Sullivan & Cromwell"), the Company's outside legal counsel, on developments in the banking industry, including consolidation transactions.

44.     On December 17, 2015, the Board held a special meeting with representatives of Company management and UBS to preview the Company's business plan and strategic framework for 2016 through 2017. Those present discussed topics such as trends in the banking industry, recent merger transactions in the industry, and potential strategic transaction partners for the Company. The Board also evaluated strategic alternatives in relation to certain of the Company's individual business lines—including a potential sale of certain Company businesses, which other parties had previously indicated a potential interest in acquiring.

45.     Following the Board's evaluation and consent, in December 2015 the Company contacted a selected group of potentially interested parties regarding a potential sale of certain EverBank individual business lines.

46.     On January 21, 2016, the Board held a quarterly meeting with representatives of Company management, during which the Board approved EverBank's business plan for 2016 through 2018, and further discussed the potential sale of certain of the Company's

individual business lines. EverBank management informed the Board that they had had preliminary discussions with several parties interested in buying parts of the Company's business, and the Board instructed management to continue to evaluate and pursue a possible sale, despite the numerous challenges it might present.

47.     From December 2015 through April 2016, EverBank management had discussions with multiple private equity firms and a large domestic banking organization (referred to in the Proxy as "Party A"), each of which had indicated an interest in acquiring certain of the Company's business lines. One of the private equity firms provided the Company with a preliminary letter of interest and executed a non-disclosure agreement ("NDA") with the Company, but ultimately terminated discussions in April 2016 without making a proposal. Party A executed an NDA with the Company in March 2016 and performed preliminary due diligence.

48.     On April 21, 2016, the Board held a quarterly meeting with representatives of Company management and UBS. Company management advised the Board that the Company had been approached by a banking organization (referred to in the Proxy as "Party B") regarding a possible business combination. In light of challenges associated with the sale of certain Company businesses, interest received from Party B, and other interest rate and capital market considerations, the Board decided to create a list of other potential merger partners. The Board also established a committee to evaluate potential transactions (the "Transaction Committee") consisting of Lovett, Mylod and Stuart.

49.     On April 29, 2016, the Transaction Committee held a telephonic meeting with representatives of Company management and UBS to review potential merger partners and

provide an update on recent discussions with Party B. UBS provided an initial list of seven potentially interested parties to contact, including Party B, TIAA and a large international banking organization (referred to in the Proxy as "Party C"). The Transaction Committee authorized UBS to reach out to each of the seven parties in order to determine if they would be interested in engaging in exploratory discussions.

50.     Beginning the week of May 2, 2016, UBS contacted each of the seven parties to solicit interest.

51.     On May 4, 2016, the Company executed an NDA with Party B.

52.     On May 5, 2016, members of EverBank senior management and Party B met in New York City to discuss a possible business combination.

53.     On May 6, 2016, TIAA informed UBS that it was interested in exploring a potential combination and was not capital or liquidity constrained.

54.     Also on May 6, 2016, the Transaction Committee held a telephonic meeting with representatives of Company management and UBS to discuss the possibility of considering other potential strategic partners and the likelihood of such potential partners' interest. After discussion, the Transaction Committee authorized UBS to contact only one additional party—which UBS contacted that party later that week.

55.     On May 7, 2016, the Company executed an NDA with TIAA.

56.     On May 11, 2016, the Transaction Committee held a telephonic meeting with representatives of Company management and UBS, during which the Transaction Committee authorized UBS to approach four additional parties. UBS contacted the four additional parties later that week.

57.     On May 17, 2016, the Transaction Committee held a telephonic meeting with representatives of Company management, UBS and Sullivan & Cromwell, during which UBS informed the Transaction Committee that of the 12 parties contacted, Party B, Party C and TIAA had expressed interest in exploring a possible transaction with EverBank. The Transaction Committee authorized Company management and UBS to move forward with a possible transaction with Party B, Party C and TIAA, and to continue exploring a possible sale of certain Company businesses to Party A. The Transaction Committee also granted Party B and TIAA access to certain non-public information.

58.     On May 19, 2016, the Company executed an NDA with Party C. Also on that day, EverBank senior management held separate meetings with TIAA and Party B in New York City.

59.     On May 24, 2016, the Transaction Committee held a telephonic meeting with representatives of Company management, UBS and Sullivan & Cromwell to discuss next steps of the process, including distributing process letters to TIAA and Party B and setting a first round bid date of June 6, 2016. The Transaction Committee authorized distributing the process letters and authorized UBS to approach an additional party, which decided not to participate in the process.

60.     On May 25, 2016, senior management of EverBank and Party B met in Jacksonville, Florida for Party B to conduct additional diligence of the Company.

61.     On May 27, 2016, process letters were sent to TIAA, Party B and their respective advisors, which indicated a June 6, 2016 deadline for non-binding written proposals.

62.     On June 6, 2016, UBS received a non-binding written proposal from TIAA to acquire EverBank through a merger transaction at a price between $19.00 and $20.00 per share in cash. Also on June 6, 2016, Party B indicated that it was not in a position to submit a written proposal at that time.

63.     On June 7, 2016, the Transaction Committee and the Board held successive telephonic meetings with representatives of Company management, UBS and Sullivan & Cromwell to discuss TIAA's proposal.  Following the meetings and at the request of the Transaction Committee, UBS provided TIAA with the Transaction Committee's feedback on TIAA's proposal, and TIAA was invited to Phase II of the process.

64.     On June 8, 2016, TIAA was granted access to a Phase II electronic data room. Also on June 8, 2016, UBS sent a second round process letter to TIAA, requesting a written proposal, including a markup of transaction documents, by no later than 5:00 p.m. eastern time on June 27, 2016, which deadline was subsequently extended to June 30, 2016.

65.     On June 9, 2016, Party C was granted access to the Phase I data room.  Later in June, Party C indicated it would not be in a position to pursue a potential transaction with the Company until a later time.

66.     Throughout the month of June, TIAA and its advisors undertook due diligence and negotiations with EverBank and its advisors.

67.     On June 24, 2016, EverBank received a preliminary indication of interest from Party A regarding the potential purchase of certain Company businesses.

68.     On June 30, 2016, EverBank received a written proposal from TIAA, including a markup of the merger agreement.  TIAA proposed a transaction in which

Company common stockholders would receive $19.25 in cash per share, or $2.479 billion in the aggregate. The written proposal stated that it would expire on July 5, 2016, unless the EverBank agreed to a 30-day exclusivity period. TIAA sent EverBank a proposed exclusivity agreement on June 30, 2016. The markup of the merger agreement stipulated that certain of the Company's stockholders, directors and executive officers would be *required* to enter into voting agreements to support the Proposed Transaction.

69.     On July 1, 2016, the Transaction Committee and the Board held telephonic meetings with representatives of Company management, UBS and Sullivan & Cromwell to discuss TIAA's proposal and Party A's proposal regarding the possible sale of certain Company businesses. The Board directed UBS to explore an increase in TIAA's proposal price to $20.00 per share. Subsequently, UBS contacted TIAA's financial advisor, Lazard Frères & Co. LLC ("Lazard"), to request an increase in proposal price to $20.00 per share.

70.     On July 3, 2016, Lazard informed UBS that TIAA was willing to revise its proposal price to $20.00 per share in cash, or a total transaction value of approximately $2.58 billion, on the assumption that TIAA would be granted exclusivity. The revised proposal also included a proposal to cash out Company preferred stock at the liquidation preference of $25,000 per share.

71.     Also on July 3, 2016, the Transaction Committee held a telephonic meeting with representatives of EverBank management, UBS and Sullivan & Cromwell to discuss TIAA's revised offer.

72.     On July 5, 2016, the Board held a special telephonic meeting with representatives of Company management, UBS and Sullivan & Cromwell. During the

meeting, the parties discussed TIAA's proposal of $20.00 per share, proposed merger agreement, voting agreements and exclusivity agreement, as well as Party A's proposal regarding the possible sale of certain Company businesses. At the conclusion of the meeting, the Board authorized and directed Company management, UBS and Sullivan & Cromwell to proceed with TIAA's revised proposal, further negotiations and execution of the exclusivity agreement. The Board also decided not to proceed with Party A's proposal. Following the meeting, the Company entered into an exclusivity agreement with TIAA to expire on July 24, 2016. Pursuant to the exclusivity agreement, discussions with other parties were put on hold.

73.     On July 9, 2016, and throughout the following week, senior management of the Company and TIAA met in Jacksonville, Florida to discuss topics such as the Company's business strategy and integration considerations.

74.     On July 21, 2016, Lazard informed UBS that following TIAA's conclusion of due diligence and a subsequent TIAA board meeting, TIAA was willing to move forward with a transaction at a purchase price of no more than $19.00 per share. UBS communicated the foregoing to the Company, and the Transaction Committee directed UBS to provide TIAA with additional information regarding the Company's second quarter results in order to seek an increase in TIAA's proposed purchase price.

75.     On July 22, 2016, following negotiations between Clements and TIAA President and CEO Roger W. Ferguson, Jr. ("Ferguson"), TIAA revised its proposal price to $19.50 per share.

76.     At the end of the day on July 24, 2016, the exclusivity period expired.

77.     On the morning of July 25, 2016, Bloomberg reported that EverBank was working with UBS to explore a sale. Shortly after, a New York Stock Exchange representative inquired into the report's validity. The Transaction Committee held several telephonic meetings later that day with representatives of Company management, UBS and Sullivan & Cromwell to discuss EverBank's next steps in light of the report. EverBank subsequently issued its second quarter earnings release on July 26, 2016—one day earlier than planned, along with a press release regarding a possible transaction.

78.     On the evening of July 25, 2016, the Board held a special telephonic meeting with representatives of Company management, UBS and Sullivan & Cromwell to discuss TIAA's $19.50 per share proposal, the potential press release, and an extension of the exclusivity agreement between EverBank and TIAA. After the discussion, the Board authorized and directed EverBank's advisors to continue pursuing TIAA's $19.50 per share proposal, extend exclusivity with TIAA to, at the latest, August 8, 2016, and announce the Company's second quarter earnings a day early. That same evening, EverBank and TIAA executed an extension of the exclusivity agreement through August 8, 2016.

79.     On the morning of July 26, 2016, the Company announced its second quarter financial results and issued a press release that indicated the Company was involved in negotiations with a reputable financial services company to acquire EverBank for $19.50 per share in cash.

80.     Following execution of the exclusivity agreement and through the beginning of August 2016, negotiations among the Company, TIAA and their legal advisors continued regarding the merger agreement and voting agreements.

81.     From July 28, 2016 through August 1, 2016, TIAA and representatives of EverBank met with Standard & Poor's, Moody's Investors Service, Fitch Ratings and A.M. Best to review the transaction and its impact on TIAA's ratings.

82.     On August 2, 2016, the Transaction Committee held a telephonic meeting with representatives of Company management, UBS and Sullivan & Cromwell to discuss the status of negotiations with TIAA.

83.     On August 3, 2016, various publications identified TIAA as the party with which the Company was in advanced talks.

84.     On August 4, 2016, the Board held a quarterly meeting with representatives of Company management, UBS and Sullivan & Cromwell to consider, among other things, the proposed transaction with TIAA.   Company management and the Transaction Committee recommended the transaction to the Board.   After extensive discussion, the meeting was placed into recess in light of continued negotiations.

85.     On August 6, 2016, Lazard informed UBS that TIAA had received feedback from the ratings agencies, and that TIAA was satisfied with such feedback.

86.     On August 7, 2016, the Board reconvened the recessed August 4 meeting. EverBank management and its advisors updated the Board regarding events since August 4, 2016, including TIAA's satisfactory feedback from the ratings agencies.   Thereafter, at the request of the Board, UBS provided its fairness opinion.   The Board subsequently approved the Merger Agreement and resolved to recommend that EverBank stockholders approve the Proposed Transaction.

87.   On the evening of August 7, 2016, EverBank and TIAA finalized and executed the Merger Agreement.  The next morning, EverBank and TIAA issued a joint press release announcing the Proposed Transaction.

**The Proposed Transaction is Inadequate**

88.   On August 7, 2016, following the Board's approval, EverBank entered into the Merger Agreement with TIAA and its subsidiaries for inadequate consideration.  The next morning, EverBank and TIAA issued a joint press release stating, in relevant part:

> NEW YORK & JACKSONVILLE, Fla.-- TIAA, a leading financial services provider, announced today an agreement to acquire EverBank (NYSE: EVER), a nationwide consumer and commercial bank with $27.4 billion in total assets. This acquisition significantly expands TIAA's banking and lending products and complements the company's full suite of retirement, investment and advisory services available to help customers achieve financial well-being.
>
> Under the terms of the agreement, EverBank stockholders will receive $19.50 per share in cash, or an approximate total of $2.5 billion. The combination of TIAA's existing banking operations and EverBank will significantly bolster TIAA's banking capabilities and form a full-service banking company uniquely positioned to help both companies' customers succeed.

89.   The Merger Consideration fails to recognize the value of EverBank to TIAA. In the joint press release, Ferguson detailed the benefits TIAA will enjoy as a result of the Proposed Transaction:

> I am very excited to welcome EverBank to the TIAA team. EverBank's complementary capabilities and two decades of profitability make this an excellent investment and a great strategic fit for TIAA. Together, we look forward to bringing an enhanced level of service and an expanded range of financial solutions to our millions of loyal customers and the institutions we serve.

90.   Given the potential for increased growth and strong earnings, the Proposed Transaction fails to adequately compensate EverBank's stockholders for the intrinsic value of

the Company, as well as the significant benefits TIAA will receive from the Proposed Transaction. TIAA is seeking to acquire the Company at a time when the long-term prospects of EverBank are increasing, and while its stock price is undervalued. For example, as recently as July 26, 2016, analyst Jefferson L. Harralson at Keefe, Bruyette & Woods set a $21.00 target price for EverBank, which is $1.50 above the $19.50 Merger Consideration. Moreover, the Merger Consideration is a significant discount to EverBank stock's 52-week trading high of $20.76 per share. Additionally, the Company's stock traded above the Merger Consideration as recently as October 27, 2015, when it reached $20.07 per share.

91.     Moreover, during an all-employee TIAA phone call after issuing the joint press release, Ferguson explained the benefits TIAA will enjoy as a result of the Proposed Transaction:

> So why are we doing this? Several years ago *we decided we needed to add banking services to our portfolio of capabilities*, not only to achieve our long-term strategy, but more importantly, to fulfill our customer-focused mission. Because lifetime financial well-being is built on a lifelong series of financial decisions, and for most people, that starts with savings.
>
> * * *
>
> Some of you might be wondering how we can afford to do this in today's challenging economic environment. I might say that *we can't afford NOT to do it.* It's true that we need to continually manage expenses prudently in response to the financial pressures driven by interest rates that have been much lower for much longer than originally forecast and also by ongoing market volatility and uncertainty.    But we need to work both sides of the margin equation, growing revenue and managing expenses. That means we'll continue to invest in the business and *seize smart opportunities that help us* achieve our goals including the right inorganic opportunities *like this one.* This is about *strengthening our organization* so that we can continue to keep our promises to our customers for the next century.
>
> * * *
>
> It's important to note, this is not an acquisition driven by cost-cutting synergies. *This is about growing our business*, serving our institutional and individual customers in new ways and *strengthening our company for the future.*

Emphasis added.

92.     An August 8, 2016 *New York Times* article entitled "TIAA-EverBank Deal Offers a Lesson on Acquisitions" noted that TIAA's rationale for the Proposed Transaction is "supercharging the growth of its four-year-old internet bank, TIAA Direct," which has just $4 billion in deposits—compared with approximately $19 billion in deposits at EverBank. The article further stated that deals like the Proposed Transaction "up the ante for banks in general, with the opportunity for growth a rare luxury that most financial institutions can only dream about."

93.     Also on August 8, 2016, Fitch Ratings issued a press release announcing that it affirmed TIAA's ratings following the announcement of the Proposed Transaction. In the press release, Fitch Ratings detailed the benefits TIAA will enjoy as a result of the Proposed Transaction:

> Fitch believes the acquisition of Everbank would bring TIAA's banking business to scale and offer opportunities to cross-sell TIAA products to Everbank's deposit customers and more readily allow TIAA to offer banking products to existing customers. Everbank bolsters TIAA's retail services offering by adding direct product capabilities such as residential mortgages to provide to retail customers. Additionally, Everbank's residential mortgage origination capabilities allow TIAA direct access to add residential mortgages to its general account.

94.     On August 10, 2016, *Bloomberg* published an article entitled "TIAA EverBank Deal Gives Ferguson Way Out If Regulators Balk." The article explained that the Merger Agreement includes an "escape clause that means TIAA can nix the deal if it meets stiff resistance from the Federal Reserve or Office of the Comptroller of the Currency." The article noted that experts believe the inclusion of the "escape clause" matters because "it may

allow TIAA to end the deal without slogging through a long approval process." The article further noted that EverBank must pay a $93.2 million termination fee, while the Merger Agreement "doesn't call for TIAA to pay a termination fee."

95.     An August 11, 2016 *Jacksonville Business Journal* article entitled "What's next for EverBank – Inside the $2.5 billion sale" quoted JaxUSA President Jerry Mallot ("Mallot") as stating that the acquisition will be a catalyst for the Company's growth. Mallot further explained:

> I think this is going to have a substantial and positive impact on the EverBank that we know today. The purchase was done intentionally with the opportunity for growth.

**The Board Impermissibly Locked Up the Proposed Transaction**

96.     The Merger Agreement contains deal protection devices which substantially increase the likelihood that the Proposed Transaction will be consummated, leaving EverBank's public stockholders with no meaningful change of control premium for their shares. When viewed collectively, these provisions, which are detailed below, further the interests of TIAA, certain Individual Defendants and other EverBank insiders to the detriment of EverBank's public stockholders and cannot represent a justified, appropriate or proportionate response to any threat posed by a potential third party bidder.

97.     The Individual Defendants have agreed to the following unreasonable deal protection devices:

- A "no-solicitation" clause that prevents EverBank from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, Section 6.9(a));

- An "information rights" provision that requires the Company to promptly advise Parent of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 6.9(a));

- A "matching rights" provision that allows TIAA five (5) business days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation, plus an additional five (5) business day period following a material amendment to the terms and conditions of a superior offer or the submission of a new offer (Merger Agreement, Section 6.3(a));

- A provision that requires that the Company use its reasonable best efforts to enforce any existing confidentiality, standstill or similar agreement to which EverBank or any of its subsidiaries is a party (Merger Agreement, Section 6.9(a)); and

- A termination fee of $93.2 million payable by the Company to TIAA if EverBank decides to pursue a competing bid (Merger Agreement, Section 8.2); and

- A "force the vote" provision that requires that the Board submit the Proposed Transaction to a stockholder vote even if the Board has withdrawn its recommendation (Merger Agreement, Section 6.3(a)).

98. The "no-solicitation" clause, the "information rights" provision, the "matching rights" provision, the provision requiring enforcement of any confidentiality agreements, the termination fee and the "force the vote" provision unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under

which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

99. The reason behind these deal protection devices is clear: the absence of a meaningful premium for stockholders creates the very real potential that a third party bidder will attempt to usurp TIAA and submit a higher bid for EverBank. The possibility that a third-party bidder will emerge motivated TIAA to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that TIAA could purchase the Company for less than would otherwise be possible.

100. Taken as a whole, the foregoing deal protection devices essentially foreclose the possibility that a third-party "white knight" could step forward to provide EverBank stockholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction.

**Insiders' Interests in the Proposed Transaction**

101. TIAA and EverBank insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of EverBank.

102. While EverBank's public stockholders are receiving inadequate consideration for their valuable EverBank holdings, the Company's directors and officers will achieve a

substantial payday.   Pursuant to the Merger Agreement, upon consummation of the

Proposed Transaction, EverBank's directors and officers will receive cash payments from

the immediate vesting of all company common stock options, restricted stock options

performance-based restricted stock options, whether or not vested – an opportunity that

would not otherwise be available.   The following table summarizes the number of stock

options, restricted stock units and performance-based restricted stock units held by the

Company's executive officers and the cash amounts payable in respect thereof, in

connection with the Proposed Transaction:

| | Unvested RSUs (#) | Aggregate Merger Consideration in Respect of RSUs ($) | Unvested Options (#) | Aggregate Merger Consideration in Respect of Unvested Options ($) | PBRSUs (#) | Aggregate Merger Consideration in Respect of PBRSUs ($) | Estimated Total Merger Consideration in Respect of Company Equity Awards ($) (2) |
|---|---|---|---|---|---|---|---|
| **Executive Officers** | | | | | | | |
| Robert M. Clements | 114,724 | 2,237,118 | 200,212 | 239,871 | 45,968 | 896,376 | 3,372,365 |
| W. Blake Wilson | 105,416 | 2,055,612 | 183,467 | 219,287 | 42,432 | 827,424 | 3,102,323 |
| Steven J. Fischer | 34,208 | 667,056 | 60,854 | 71,696 | 13,260 | 258,570 | 997,322 |
| John S. Surface | 34,229 | 667,466 | 60,912 | 71,748 | 13,260 | 258,570 | 997,783 |
| Francis X. Ervin, Jr. | 36,059 | 703,151 | 30,705 | 36,662 | 8,340 | 172,380 | 912,193 |
| James R. Hubbard | 13,701 | 267,170 | 17,603 | 0 | 7,956 | 155,142 | 422,312 |
| Non-Employee Directors (as a group) (1) | 24,731 | 482,255 | — | — | — | — | 482,255 |

103.   Further, if they are terminated in connection with the Proposed Transaction,

EverBank's named executive officers are set to receive substantial cash payments in the form

of golden parachute compensation.   Defendants Clements and Wilson stand to receive

over $8 million and $7.17 million, respectively, in severance benefits if they are not

retained after consummation of the Proposed Transaction, as detailed in the chart below:

| | Cash ($) (1) | Equity ($) (2) | Tax Reimbursement ($) (3) | Total ($) |
|---|---|---|---|---|
| Robert M. Clements | 4,674,535 | 3,372,365 | $ 0 | 8,046,900 |
| W. Blake Wilson | 4,075,135 | 3,102,323 | $ 0 | 7,177,458 |
| Steven J. Fischer | 987,955 | 997,322 | — | 1,985,277 |
| John S. Surface | 987,971 | 997,783 | — | 1,985,754 |
| Francis X. Ervin, Jr. | 748,312 | 912,193 | — | 1,660,505 |

104.    Moreover, EverBank's directors and officers will receive substantial cash consideration for their significant holdings of EverBank stock.    By pursuing and approving the Proposed Transaction, the Company's directors and officers will gain liquidity for their otherwise illiquid Company holdings.    Defendant Clements *alone* holds over 3.56 million EverBank shares worth approximately $57.6 million if cashed out in connection with the Proposed Transaction.    The holdings of the Company's officers and directors were disclosed in the Proxy, as seen in the following chart:

| Name and Address of Beneficial Owner | Shares Beneficially Owned as of August 31, 2016 | |
|---|---|---|
| | Number | Percentage |
| **Named Executive Officers and Directors:** | | |
| Robert M. Clements (1) | 3,656,356 | 2.88% |
| W. Blake Wilson (2) | 2,281,019 | 1.79% |
| Steven J. Fischer (3) | 100,369 | * |
| Francis X. Ervin, Jr. | 16,677 | * |
| John S. Surface (4) | 961,038 | * |
| Joseph D. Hinkel (5) | 22,030 | * |
| Merrick R. Kleeman (6) | 277,399 | * |
| W. Radford Lovett, II (7) | 1,449,108 | 1.16% |
| Arrington H. Mixon (8) | 11,280 | * |
| Robert J. Mylod, Jr. (9) | 511,915 | * |
| Russell B. Newton, III (10) | 4,018,163 | 3.20% |
| William Sanford (11) | 12,030 | * |
| Richard P. Schifter (12) | — | — |
| Scott M. Stuart (13) | 10,312,230 | 8.22% |
| All directors and executive officers as a group (14 persons) | 23,629,614 | 18.22% |

105.    In addition to producing a liquidity event for their EverBank holdings, defendants Wilson and Clements were further incentivized to steer the Company toward a transaction with TIAA in order to secure a position with the post-merger combined company. Indeed, defendant Wilson has secured a position as President and CEO of the combined company and defendant Clements stands to enjoy employment as a member of the board of directors of the combined company.    In addition, Fischer will serve as CFO of the combined company.

106.    Moreover, defendant Wilson and certain EverBank executive officers have

negotiated cash transaction awards for themselves in connection with the Proposed Transaction. Specifically, defendant Wilson, Fischer, John S. Surface, Francis X. Ervin, Jr. and James R. Hubbard have entered into letter agreements with Parent which provide for a cash transaction award equal to $3,860,000, $860,000, $860,000, $660,000 and $630,000, respectively. Each transaction award will become payable in equal portions on the 18 and 24 month anniversaries of the closing of the Proposed Transaction, with accelerated payment if the executive's employment is terminated under certain circumstances, so long as the executive is not otherwise receiving severance benefits as a result of that termination.

107. Unsurprisingly, concurrent with the execution of the Merger Agreement on August 7, 2016, certain undisclosed EverBank directors, executive officers and large stockholders entered into voting agreements with TIAA agreeing to, among other things, vote their EverBank shares (which according to the joint press release constitute approximately 22% of the outstanding Company shares) in favor of the Proposed Transaction. TIAA *required* the signing of the voting agreements as a condition of agreeing to the Proposed Transaction. In a breach of their fiduciary duties, the Board failed to negotiate for a provision in the Merger Agreement that would have conditioned the Proposed Transaction's approval on the support of a majority of unaffiliated EverBank stockholders. Thus, with certain EverBank directors, executive officers and large stockholders pledging their approximately 22% equity stake in support of the Proposed Transaction, no more than 28.01% of the Company's remaining stockholders need to support the deal for it to be approved.

108. Therefore, while EverBank's public stockholders will lose control of the

Company for an unfair price, certain Company insiders will substantially benefit if the Proposed Transaction is consummated.

**The Proxy Contains Numerous Material Misstatements or Omissions**

109.   Compounding the unfair sale process and the inadequacy of the Merger Consideration, the defendants also filed the materially incomplete and misleading Proxy with the SEC and disseminated it to EverBank's stockholders.  The Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

110.   Specifically, as set forth below, the Proxy fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) EverBank management's projections, utilized by UBS in its financial analyses; (ii) the valuation analyses prepared by UBS in connection with the rendering of its fairness opinion; and (iii) material information concerning the sale process leading up to the Proposed Transaction.   Accordingly, EverBank stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

**Material Omissions Concerning EverBank's Financial Projections**

111.   The Proxy is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

112.   Specifically, the Proxy fails to disclose the individual EverBank projections, for the fiscal years ended December 31, 2016 through December 31, 2022, for the following items: (a) book value; (b) tangible book value; (c) tangible common equity; (d) tangible assets; (e) tangible common equity/tangible assets; (f) return on average assets; (g) return on

average equity; (h) nonperforming assets; (i) tier 1 leverage ratio; (j) tier 1 capital ratio; (k)

loans/assets; (l) loan loss reserve/gross loans; (m) net charge-offs/average loans; (n) total

risk based capital ratio; (o) core deposits; (p) net interest margin; (q) noninterest income; (r)

efficiency ratio; (s) dividends per share (or cash available for dividends); and (t) free cash

flow.

  113. The omission of this information renders the following statements in the

Proxy false and/or materially misleading in contravention of the Exchange Act:

    (a)  from pages 39-40 of the Proxy:

> The following table summarizes selected unaudited prospective financial
> data for the fiscal years ending December 31, 2016 through December 31,
> 2022. The Company board and UBS were provided with unaudited
> prospective financial information with respect to the Company prepared by
> management of the Company for the fiscal years ending December 31, 2016
> through December 31, 2022. TIAA was provided only with such unaudited
> prospective financial information with respect to the Company for the fiscal
> years ending December 31, 2016 through December 31, 2017.

**Income Statement Data**

| (as of December 31 of each year, dollars in millions other than per share amounts): | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|
| Total revenue | $ 907 | $ 941 | $1,002 | $1,056 | $1,113 | $1,172 | $1,236 |
| Provision for loan and lease losses | (33) | (41) | (49) | (49) | (52) | (56) | (59) |
| Noninterest expense | 585 | 565 | 594 | 618 | 643 | 669 | 696 |
| Net income | 179 | 208 | 222 | 241 | 259 | 278 | 298 |
| Adjusted net income | 182 | 200 | 222 | 241 | 259 | 278 | 298 |
| Net earnings per common share, diluted | 1.33 | 1.54 | 1.65 | 1.77 | 1.90 | 2.03 | 2.16 |
| Adjusted net earnings per common share, diluted | 1.36 | 1.48 | 1.65 | 1.77 | 1.90 | 2.03 | 2.16 |

**Balance Sheet Data**

(as of December 31 of each year, dollars in millions):

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|
| Total assets | 27,94 | 29,73 | 31,26 | 32,87 | 34,57 | 36,35 | 38,28 |
| | $ 2 | $ 7 | $ 6 | $ 6 | $ 0 | $ 2 | $ 8 |
| Common equity Tier 1 ratio | % | % | % | % | % | % | % |
| | 10.1 | 9.9 | 10.1 | 10.3 | 10.5 | 10.7 | 10.8 |

### Non-GAAP Financial Measures

Adjusted net income and adjusted net earnings per common share, diluted are non-GAAP financial measures. The Company's management uses these measures to evaluate the underlying performance and efficiency of its operations. The Company's management believes these non-GAAP measures provide meaningful additional information about the operating performance of the Company's business and facilitate a meaningful comparison of its results because these non-GAAP measures exclude certain items that may not be indicative of the Company's core operating results and business outlook. Adjusted net earnings per common share, diluted is calculated using a numerator based on adjusted net income. Adjusted net earnings per common share, diluted is a non-GAAP financial measure and its most comparable GAAP measure is net earnings per common share, diluted. Adjusted net income's most comparable GAAP measure is net income. A reconciliation of adjusted net income to net income and a related calculation of adjusted net earnings per common share, diluted are as follows:

(as of December 31 of each year, dollars in millions other than per share amounts):

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|
| Net income | $179 | $208 | $222 | $241 | $259 | $278 | $298 |
| Mortgage servicing rights (MSR) impairment (recovery), net of tax | 2 | (7) | — | — | — | — | — |
| Adjusted net income | $182 | $200 | $222 | $241 | $259 | $278 | $298 |
| Adjusted net income allocated to Company preferred stock | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| Adjusted net income allocated to Company common stockholders | $172 | $190 | $212 | $231 | $248 | $267 | $288 |
| Average diluted common shares outstanding | 127 | 128 | 129 | 130 | 131 | 132 | 133 |
| Adjusted net earnings per common share, diluted | 1.3 | 1.4 | 1.6 | 1.7 | 1.9 | 2.0 | 2.1 |
| | $ 6 | $ 8 | $ 5 | $ 7 | $ 0 | $ 3 | $ 6 |

**Material Omissions Concerning UBS' Financial Analyses**

114.   The Proxy describes UBS' fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of UBS' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, EverBank's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on UBS' fairness opinion in determining whether to vote in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to EverBank's stockholders.

115.   The Proxy fails to disclose various material elements of the financial analysis by UBS.  For example, UBS performed a *Selected Companies Analysis* that was presented to the Board, yet the Proxy fails to disclose the individual multiples for each of the selected public companies analyzed by UBS or, at the very least, the low and high multiples observed by UBS and the Board, as well as any benchmarking analyses UBS performed for EverBank in relation to the selected public companies.  Moreover, as UBS failed to select and apply multiples to EverBank, the individual multiples are critical for EverBank stockholders to assess the Proposed Transaction.

116.   Similarly, UBS performed a *Selected Transactions* analysis that was presented to the Board, yet the Proxy fails to disclose the individual multiples for each of the selected transactions analyzed by UBS or, at the very least, the low and high multiples observed by UBS and the Board, as well as any benchmarking analyses UBS performed for EverBank in relation to the target companies.  The disclosure of the individual multiples is particularly

important because all of the multiples for the Company implied by the Merger Consideration are below the mean and median multiples observed for the selected transactions. Moreover, as UBS failed to select and apply multiples to EverBank and TIAA's merger, the individual multiples are critical for EverBank stockholders to assess the Proposed Transaction.

117.    With respect to UBS' *Dividend Discount Analysis* that was presented to the Board, the Proxy fails to disclose: (i) the individual inputs and assumptions utilized by UBS to derive the discount rate range of 9.0% to 12.0%; (ii) the method UBS used to determine the discount rate range; and (iii) the implied perpetuity growth rate range resulting from this analysis.

118.    The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)      from pages 43-45 of the Proxy:

**Selected Companies Analyses**

UBS considered certain financial data for the Company and selected companies with publicly traded equity securities UBS deemed generally relevant. The selected companies were selected because they were deemed to be similar to the Company in one or more respects, including, without limitation, size and business mix. Unless the context indicates otherwise, share prices for the Company were as of July 22, 2016, the last trading day prior to the date on which a news organization reported publicly that the Company was exploring a sale. Share prices for the selected companies used in the selected companies analysis described below were as of August 5, 2016. The estimates of the Company's future financial performance for the next 12 months and for the years ending December 31, 2016 and 2017 used in the selected companies analysis described below were based on publicly available research analyst estimates for the Company as of the day prior to the announcement of the merger and forecasts provided by Company management (except where the Company's share price as of July 22, 2016 was utilized, in which case publicly available research analyst estimates for the Company as of July 22, 2016 were utilized). Estimates of the future financial performance of the selected companies listed below for the next 12

months and for the years ending December 31, 2016 and 2017 were based on publicly available research analyst estimates for those companies.

The financial data reviewed included:
• Share price as a multiple of historical adjusted/operating per share earnings for the previous 12 months where available as reported in public filings, or "Price/ LTM Core EPS";

• Share price as a multiple of estimated per share earnings for the next 12 months, or "Price/ NTM EPS";

• Share price as a multiple of estimated per share earnings for the year ended December 31, 2016, or "Price/ 2016E EPS";

• Share price as a multiple of estimated per share earnings for the year ended December 31, 2017, or "Price/ 2017E EPS"; and

• Share price as a multiple of tangible book value per share as of June 30, 2016, or "Price/ Tangible Book Value."

The selected companies were:

• Peoples United Financial, Inc.

• East West Bancorp, Inc.

• First Horizon National Corporation

• Webster Financial Corporation

• BankUnited, Inc.

• Associated Banc-Corp

• IBERIABANK Corporation

• TCF Financial Corporation

• Texas Capital Bancshares, Inc.

The resulting mean and median multiples for the selected companies and the corresponding trading multiples for the Company and multiples for the Company implied by the merger consideration in the merger were:

| | Price / | | | | |
| --- | --- | --- | --- | --- | --- |
| | LTM Core EPS | NTM EPS | 2016E EPS | 2017E EPS | Tangible Book Value |
| **Selected Companies** | | | | | |
| Median | 16.6 | 14.8 | 15.6 | 14.1 | 1.52 |
| | x | x | x | x | x |
| Mean | 15.5 | 14.3 | 15.2 | 13.8 | 1.60 |
| | x | x | x | x | x |
| **The Company (price as of July 22, 2016)** | | | | | |
| Analyst estimates | 12.8 | 10.5 | 11.2 | 10.0 | 1.17 |
| | x* | x | x | x | x* |
| Company management estimates | 12.8 | 10.9 | 11.4 | 10.5 | 1.17 |
| | x* | x | x | x | x* |
| **The Company (merger consideration of $19.50)** | | | | | |
| Analyst estimates | 16.1 | 13.5 | 14.3 | 13.0 | 1.47 |
| | x* | x | x | x | x* |
| Company management estimates | 16.1 | 13.7 | 14.3 | 13.2 | 1.47 |
| | x* | x | x | x | x* |

\* Historical Company figures per publicly available information.

### Selected Transactions Analysis

UBS also considered the financial terms of certain business combinations and other transactions UBS deemed generally relevant. The selected transactions included bank transactions with a deal value greater than $1.0 billion since January 1, 2013. The estimates of the Company's future financial performance for the next 12 months used in the selected transactions analysis described below were based on publicly available research analyst estimates for the Company as of the day prior to the announcement of the merger and forecasts provided by Company management. Estimates of the future financial performance of the target companies listed below for the next 12 months were based on publicly available research analyst estimates for those companies as of the day prior to the announcement of the relevant transaction.

The financial data reviewed included the implied share price (based on the value of the per share consideration proposed to be paid in the selected transactions) as a multiple of relevant target company's adjusted/operating earnings per share for the last 12 months where available as reported in public filings, or "LTM Core EPS," as a multiple of earnings per share for the next 12 months, or "NTM EPS," and as a multiple of tangible book value per share as of the most recent quarter, or "Tangible Book Value."

The selected transactions were:

| Date Announced | Acquiror | Target |
|---|---|---|
| 07/16 | F.N.B. Corporation | Yadkin Financial Corporation |
| 06/16 | Canadian Imperial Bank of Commerce | PrivateBancorp, Inc. |
| 01/16 | Huntington Bancshares Incorporated | FirstMerit Corporation |
| 01/16 | Chemical Financial Corporation | Talmer Bancorp, Inc. |
| 12/15 | BBCN Bancorp, Inc. | Wilshire Bancorp, Inc. |
| 10/15 | KeyCorp | First Niagara Financial Group, Inc. |
| 10/15 | New York Community Bancorp, Inc. | Astoria Financial Corporation |
| 08/15 | BB&T Corporation | National Penn Bancshares, Inc |
| 1/15 | Royal Bank of Canada | City National Corporation |
| 11/14 | BB&T Corporation | Susquehana Bancshares, Inc. |
| 07/14 | CIT Group Inc. | IMB HoldCo LLC |
| 09/13 | Umpqua Holdings Corporation | Sterling Financial Corporation |

The resulting mean and median multiples for the selected transactions and the corresponding multiples for the Company implied by the merger consideration in the merger were:

| | Price / | | |
|---|---|---|---|
| | LTM Core EPS | NTM EPS | Tangible Book Value |
| **Selected Transactions** | | | |
| Median | 19.3x | 17.7x | 1.73x |
| Mean | 19.5x | 18.4x | 1.87x |
| **The Company (merger consideration of $19.50)** | | | |
| Analyst estimates | 16.1x* | 13.5x | 1.47x* |
| Company management estimates | 16.1x* | 13.7x | 1.47x* |

* Historical Company figures per publicly available information.

### *Dividend Discount Analysis*

UBS performed a dividend discount analysis of the Company based on the forecasts prepared by Company management that the Company directed UBS to utilize for purposes of its analysis that assumed a common equity tier one capital ratio of 10.0%. For purposes of this analysis, UBS applied a range of terminal value multiples of 9.0x to 13.0x to the Company's estimated net income for the next 12 months from December 31, 2021 and discount rates ranging from 9.0% to 12.0%. The dividend discount analysis indicated an illustrative implied valuation reference range per share of Company common stock of $13.05 to $20.34. The implied valuation reference range indicated by UBS's analysis was illustrative and not necessarily indicative of actual values

nor predictive of future results or values, which may be significantly more or less favorable than those suggested by the analysis.

119.   Without such undisclosed information, EverBank stockholders cannot evaluate for themselves whether the financial analyses performed by UBS were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which UBS' opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

**Material Omissions Concerning the Flawed Sale Process**

120.   The Proxy also fails to disclose or misstate material information relating to the sale process leading up to the Proposed Transaction, including:

(a)   Whether the Board considered retaining any other financial advisors before retaining UBS;

(b)   The timing and nature of all communications regarding future employment or directorship of EverBank's officers and directors, including, but not limited to, Clements, Wilson and Fischer, as well as who participated in all such discussions;

(c)   The details of Party A's June 24, 2016 preliminary indication of interest to purchase certain Company businesses;

(d)   Which specific individuals or entities executed voting agreements with TIAA;

(e)     The reasons why the Board did not conduct additional outreach to potentially interested parties after *Bloomberg* reported that EverBank was working with UBS to explore a sale, particularly when EverBank's exclusivity period with TIAA expired the previous day; and

(f)     Whether the NDAs the Company entered into in connection with a potential sale of the Company or certain of the Company's business lines, including, but not limited to, the NDAs EverBank entered into with (i) a private equity firm and Party A with respect to a sale of the Company's business lines; and (ii) Party B, TIAA and Party C with respect to a sale of the Company, contained standstill provisions, and if so, the details of any standstill provisions, including whether any of the parties (other than TIAA) were and are precluded from making a topping bid for the Company by the terms of the NDAs. Critically, EverBank is bound by the terms of the Merger Agreement to enforce any such standstill agreements.

121.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     from page 28 of the Proxy:

From time to time, the Company has had general discussions with other financial institutions regarding the possibility of a potential strategic transaction and has discussed this topic, as well as other available strategic alternatives, with representatives of investment banking institutions, including UBS and Centerview Partners LLC. Starting in the fourth quarter of 2015, the Company board and Company management began consulting with UBS and Sullivan & Cromwell LLP, the Company's outside legal counsel (which we refer to as "Sullivan & Cromwell"), on developments in the banking industry, including consolidation transactions.

(b)     from page 47 of the Proxy:

***Transaction Award Letter Agreements***

Certain of our executive officers, including Messrs. Wilson, Fischer, Surface, Ervin and Hubbard have entered into letter agreements with TCT Holdings (each, a "letter agreement" and collectively, the "letter agreements") which provide for a cash transaction award equal to $3,860,000, $860,000, $860,000, $660,000 and $630,000, respectively. Each transaction award will become payable in equal portions on the 18 and 24 month anniversaries of closing, with accelerated payment if the executive's employment is terminated prior to such time due to death or permanent disability, by the Company without "Cause" (as defined below) or by the executive for "Good Reason" (as defined below), so long as he is not otherwise receiving severance benefits as a result of that termination pursuant to the terms of his employment agreement with the Company (as described below). Pursuant to the terms of the letter agreements, there can be no double payment of amounts under the letter agreements and the employment agreements, as the executives may be eligible to receive payment of the cash transaction awards or the severance amounts described below, but not both.

The letter agreements with Mr. Wilson and Mr. Fischer provide that, following closing, Mr. Wilson will serve as President and Chief Executive Officer and Mr. Fischer will serve as Chief Financial Officer. Each of Messrs. Wilson and Fischer have acknowledged that they consent to their respective post-closing titles and corresponding duties and responsibilities, and as a result, have waived any right to terminate their employment for Good Reason as a result of their post-closing appointments and the occurrence of the merger. Robert Clements will retire from his positions as the Chairman and Chief Executive Officer of the Company and EverBank, effective at the closing of the merger. Mr. Clements has agreed to serve as a director of the combined federal savings association following the closing of the merger.

(c)     from page 31 of the Proxy:

On June 24, 2016, the Company received a preliminary indication of interest from Party A regarding the potential purchase of certain Company businesses. Also on June 24, 2016, it was officially announced that the United Kingdom had voted to withdraw from the European Union (i.e., "Brexit"). Following the announcement, financial markets globally experienced significant turbulence and the shares of financial services firms declined significantly.

On June 30, 2016, the Company received a written proposal, along with a markup of the merger agreement, from TIAA. TIAA indicated that it was prepared to proceed with a transaction in which Company common

stockholders would receive $19.25 in cash per share, or $2,479 million in the aggregate. The $19.25 per share in cash proposal represented a 30% premium relative to the closing price of Company common stock on June 30, 2016. The letter recited assumptions on which such proposal was based and additional terms of TIAA's proposal, including that the proposal would expire on July 5, 2016 unless the Company agreed to a 30-day exclusivity period to negotiate a definitive agreement with TIAA during which period the Company would be prohibited from discussing alternative potential transactions with, or soliciting acquisition proposals from, third parties and that certain of the Company's stockholders, directors and executive officers would be required to enter into voting agreements with respect to the transaction. Further, TIAA required that it be able to engage the rating advisory services of its rating agencies in order to have visibility on ratings by the time of announcement of a transaction. In furtherance of the foregoing, TIAA sent the Company a proposed exclusivity agreement on June 30, 2016.

(d)     from page 33 of the Proxy:

On the morning of July 25, 2016, Bloomberg reported that the Company was said to be working with UBS to explore a sale. Shortly after Bloomberg issued the report, a representative from NYSE inquired as to the validity of the report. The Company responded that: (a) the Company was scheduled to issue its earnings release on July 27, 2016 and (b) if the Company believed that it was appropriate to make a statement regarding recent news reports relating to its strategic options, it intended to do so in that earnings release. The Transaction Committee held several telephonic meetings later that day to discuss next steps in light of the report with representatives of Company management, UBS and Sullivan & Cromwell in attendance. The Transaction Committee discussed the possibility of issuing the Company's second quarter earnings release on July 26, 2016, which would be one day earlier than planned, and at the same time including a statement in the earnings press release regarding a possible transaction. The Company, TIAA and their respective legal advisors continued to negotiate the terms of the extension of the exclusivity agreement.

(e)     from pages 28-30 of the Proxy:

From December 2015 through April 2016, Company management had discussions with multiple private equity firms and a large domestic banking organization ("Party A"), each of which had indicated an interest in acquiring certain of the Company's business lines. Only one of the private equity firms provided the Company with a preliminary letter of interest. This firm executed a non-disclosure agreement (which we refer to as an "NDA") with the

Company and conducted due diligence, but ultimately chose to terminate discussions in April 2016 without making a proposal. Party A executed an NDA with the Company in March 2016 and performed preliminary due diligence.

\* \* \*

On May 4, 2016, the Company executed an NDA with Party B.

\* \* \*

On May 6, 2016, TIAA informed UBS that it was interested in exploring a potential combination and was not capital or liquidity constrained. TIAA requested an NDA in order to begin reviewing Company information. The Company executed an NDA with TIAA on May 7, 2016. Later in May, TIAA informed UBS that it had engaged Lazard Frères & Co. LLC (which we refer to as "Lazard") as its financial advisor for the process. Also, Party C indicated an interest in pursuing a possible transaction.

\* \* \*

On May 19, 2016, the Company executed an NDA with Party C. Also on May 19, 2016, senior management of the Company held separate meetings with TIAA and Party B in New York, New York. At the meeting with TIAA, the parties discussed TIAA's review of the Company. At the meeting with Party B, the parties discussed a potential business combination, including strategic, financial and regulatory considerations.

122.   Defendants' failure to provide EverBank stockholders with the foregoing material information renders the statements in the "Background of the Merger" and "Reasons for the Merger and Recommendation of the Board of Directors" sections of the Proxy false and/or materially misleading and constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable

harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act And SEC Rule 14a-9 Promulgated Thereunder**

123.    Plaintiff repeats all previous allegations as if set forth in full.

124.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

125.    During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

126.    By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the defendants. The Proxy misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual

intrinsic value of the Company's assets. The defendants were at least negligent in filing the Proxy with these materially false and misleading statements. The defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

127. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

128. By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

129. Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violation of Section 20(a) of the Exchange Act

130. Plaintiff repeats 1-122 as if set forth in full.

131. The Individual Defendants acted as controlling persons of EverBank within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of EverBank and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and

control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

132.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

133.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

134.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

135.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of EverBank, and against defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: September 23, 2016                 DURANT, SCHOEPPEL,
                                          DECUNTO & RATCHFORD, P.A.


                                          _____
                                          C. Popham Decunto (Trial Counsel)
                                          Florida Bar No. 0650021
                                          pdecunto@ds-law.net
                                          Stephen H. Durant (Trial Counsel)
                                          Florida Bar No. 180050
                                          sdurant@ds-law.net
                                          6550 St. Augustine Rd., Suite 105

Jacksonville, Florida 32217
(904) 652-2600; (904) 652-2010 Fax
*Attorneys for Plaintiff*


**WEISSLAW LLP**
Michael A. Rogovin
(pro hac vice pending)
mrogovin@weisslawllp.com
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*